UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------X
UNITED STATES OF AMERICA                    **MEMORANDUM AND ORDER**

                                            13-CR-315 (KAM)

        - against -


CLYDE FALTINE,
            Defendant.
------------------------------X
**MATSUMOTO, United States District Judge:**

        On July 7, 2015, a jury convicted Clyde Faltine

("defendant") of: (1) conspiring to distribute and to possess with

intent to distribute cocaine and marijuana; (2) possession with

intent to distribute cocaine; (3) possession with intent to

distribute cocaine base; and (4) possession with intent to

distribute marijuana. (ECF No. 209.) Defendant, in a series of

post-trial motions, seeks vacatur of each count of conviction

pursuant to Federal Rule of Criminal Procedure 29 ("Rule 29") or

alternatively a new trial pursuant to Federal Rule of Criminal

Procedure 33 ("Rule 33"). Defendant also alleges violations of

*Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*,

405 U.S. 150 (1972), by the government that he claims require

dismissal of the indictment or a new trial. For the reasons

provided herein, defendant's motions are DENIED.

**BACKGROUND**

        The court assumes familiarity with the trial record as

well as the relevant facts in this case, which are set out in

detail in the government's memoranda in opposition to defendant's motions. (*See* ECF No. 219, at 4-9; ECF No. 231, at 2-5.) *See United States v. Gottesman*, No. 13-CR-571, 2014 WL 1909482, at *1 (S.D.N.Y. May 12, 2014) (assuming familiarity with trial record and referring to government's memorandum in opposition to post-trial motions for summary of facts); *United States v. Borrero*, No. 13-CR-58, 2014 WL 1918607, at *1 (S.D.N.Y. May 12, 2014) (same).

On May 24, 2013, a grand jury returned an indictment charging defendant and others with conspiracy to distribute and to possess with intent to distribute five kilograms or more of cocaine, 28 grams or more of cocaine base, and marijuana, in violation of 21 U.S.C. § 846 (Count One); possession with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 841(a)(1) (Count Two); possession with intent to distribute 28 grams or more of cocaine base in violation of 21 U.S.C. § 841(a)(1) (Count Three); and possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1) (Count Four). (ECF No. 30, Indictment.) The government elected before trial not to proceed on the conspiracy charge with respect to cocaine base. (ECF No. 133.)

At the close of the government's case, defendant moved under Rule 29 for an acquittal. (Trial Transcript ("Tr.") 728.) The court denied the motion. (*Id.*) Before presenting his own case, defendant renewed his motion under Rule 29 for an acquittal,

focusing specifically on the conspiracy count and citing *United States v. Dickerson*, 789 F.3d 60 (2d Cir. 2015). (Tr. 765, 768.) The court again denied defendant's motion. (Tr. 768-72.) Defendant was subsequently convicted on all four counts. (ECF No. 209, Jury Verdict.)

Defendant has since filed a number of post-trial motions that are now fully briefed. (*See* ECF No. 211, Defendant's Post-Trial Motions Pursuant to Rule 29 and Rule 33 ("Def. Post-Trial Mot."); ECF No. 219, Government's Opposition to Defendant's Post-Trial Motions ("Gov't Opp'n"); ECF No. 221, Defendant's *Brady* Motion ("Def. *Brady* Mot."); ECF No. 231, Government's Opposition to Defendant's *Brady* Motion ("Gov't *Brady* Opp'n"); ECF No. 237, Defendant's Reply to Government's Opposition to *Brady* Motion ("Def. Reply"); ECF No. 240, Government's Sur-Reply ("Gov't Sur-Reply").)

## LEGAL STANDARD

Rule 29 provides that the court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Rule 29(a). "[A] defendant shoulders a heavy burden in challenging the sufficiency of evidence supporting a conviction." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (internal quotation marks and citation omitted); *see also United States v. Walker*, 142 F.3d 103, 112 (2d Cir. 1998) (same). A district court may enter a judgment of acquittal on the

grounds of insufficient evidence only if "after viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in the government's favor, it concludes no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Reyes*, 302 F.3d 48, 52 (2d Cir. 2002). The court "must be careful to avoid usurping the role of the jury," and may not substitute its "own determinations of credibility or relative weight of the evidence for that of the jury." *Autuori*, 212 F.3d at 114.

Rule 33, by contrast, permits a new trial "if the interest of justice so requires." Rule 33(a); *see also Eberhart v. United States*, 546 U.S. 12, 13 (2005) (per curiam) (recognizing that Rule 33 authorizes the court to "vacate any judgment and grant a new trial if the interest of justice so requires"). Courts have "broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but . . . nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (citation and quotation omitted). In addressing a Rule 33 motion, a court is permitted to weigh evidence and assess witness credibility. *Borrero*, 2014 WL 1918607, at *1. "However, a court should only intrude upon the jury function of credibility assessment in exceptional circumstances." *Id.* (citing *United States v. Thompson*, 528 F.3d 110, 120 (2d Cir. 2008)). "A

district court should grant a new trial motion if it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998) (internal quotation marks and citation omitted).

## DISCUSSION

Defendant's post-trial motions raise three issues: (1) whether he is entitled to an acquittal or a new trial on the conspiracy count because of the government's purported failure to establish a conspiracy; (2) whether he is entitled to an acquittal or a new trial on the three substantive counts because there was inadequate corroboration of the testimony of the two primary government witnesses; and (3) whether he is entitled to a dismissal of the indictment or a new trial based on the government's alleged suppression of certain impeachment evidence. The court will address each issue in turn.

### I.   Conspiracy Count

Defendant first argues that the government failed adequately to prove his involvement in a drug conspiracy. To establish a conspiracy, the government must show an "agreement among two or more persons to join in a concerted effort to accomplish an illegal purpose." *United States v. Parker*, 554 F.3d 230, 234 (2d Cir. 2009) (citation omitted). A member of a conspiracy must "in some sense promote [the illegal] venture

himself, make it his own, have a stake in its outcome." *United States v. Falcone*, 109 F.2d 579, 581 (2d Cir. 1940).

"An individual defendant's membership in a conspiracy may not be established simply by his presence at the scene of a crime, nor by the fact he knows that a crime is being committed." *United States v. Desimone*, 119 F.3d 217, 223 (2d Cir. 1997). Similarly, mere association with individuals involved in unlawful acts is insufficient to establish knowing involvement in a conspiracy. *United States v. Hawkins*, 547 F.3d 66, 71 (2d Cir. 2008); *United States v. Gaviria*, 740 F.2d 174, 184 (2d Cir. 1984) (recognizing that "contact with drug traffickers," standing alone, "is insufficient to prove participation in a conspiracy"). On the other hand, the government need not "prove that the defendant[] knew the details of the conspiratorial scheme or the identities of all the conspirators." *Hawkins*, 547 F.3d at 71 (internal quotation marks and citation omitted). A conspiracy is "by its very nature a secretive operation," *United States v. Provenzano*, 615 F.2d 37, 45 (2d Cir. 1980), and so the existence of and participation in a conspiracy can be established through circumstantial evidence. *United States v. Wexler*, 522 F.3d 194, 208 (2d Cir. 2008).

"As a literal matter, when a buyer purchases illegal drugs from a seller, two persons have agreed to a concerted effort to achieve the unlawful transfer of the drugs from the seller to the buyer." *Parker*, 554 F.3d at 234. The Second Circuit has held,

however, that "the mere purchase and sale of drugs does not, without more, amount to a conspiracy to distribute narcotics." *United States v. Dickerson*, 789 F.3d 60, 63 (2d Cir. 2015) (citation omitted); *United States v. Gore*, 154 F.3d 34, 40 (2d Cir. 1998) ("Without more, the mere buyer-seller relationship . . . is insufficient to establish a conspiracy."); *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1191 (2d Cir. 1989) ("[A] mere buyer-seller relationship is not necessarily a conspiracy . . . .").[1]

Where there is "additional evidence showing an agreement to join together to accomplish an objective beyond the sale transaction," the evidence may support a conspiracy conviction. *Hawkins*, 547 F.3d at 72. For example, where "there is advanced planning among the alleged co-conspirators to deal in wholesale quantities of drugs obviously not intended for personal use . . . the participants in the transaction may be presumed to know that they are part of a broader conspiracy." *United States v.*

---

[1] The policy consideration accounting for the buyer-seller exception is that federal controlled substances law distinguishes between the transfer of illegal drugs and the acquisition or possession of such drugs. *See Parker*, 554 F.3d at 234-35. Distributors are punished more harshly than users. "The buyer-seller exception thus protects a buyer or transferee from the severe liabilities intended only for transferors." *Id.* at 235; *see also United States v. Medina*, 944 F.2d 60, 65 (2d Cir. 1991) ("The rationale for holding a buyer and a seller not to be conspirators is that in the typical buy-sell scenario, which involves a casual sale of small quantities of drugs, there is no evidence that the parties were aware of, or agreed to participate in, a larger conspiracy.").

*Medina*, 944 F.2d 60, 65 (2d Cir. 1991). Additionally, if the evidence supports a finding that the buyer and seller "shared a conspiratorial purpose to advance other transfers, whether by the seller or by the buyer," the buyer-seller exception to conspiracy liability is inapplicable. *See Dickerson*, 789 F.3d at 63 (internal quotation marks and citations omitted).

Although the "highly-specific fact inquiry" into the circumstances of a buyer-seller relationship is not easily susceptible to a universally applicable inquiry, the Second Circuit has identified certain factors relevant to establishing whether the buyer-seller exception is applicable. Courts look to: (1) whether there was prolonged cooperation between the parties; (2) a level of mutual trust; (3) standardized dealings; (4) sales on credit; and (5) the quantity of drugs involved. *See Dickerson*, 789 F.3d at 64; *Hawkins,* 547 F.3d at 74; *Wexler*, 522 F.3d at 211. Other relevant factors can include: whether the buyer sought to advance the conspiracy's interests, whether there was a longstanding relationship between the buyer and seller, whether the buyer performed other duties on behalf of the conspiracy, whether the quantity of drugs purchased suggests intent to redistribute, whether the buyer's profits were shared with members of the conspiracy, and whether the buyer had the physical, financial, or other protection of the conspiracy. *See United States v. Rojas*, 617 F.3d 669, 675 (2d Cir. 2010).

An examination of the pertinent factors demonstrates that there was sufficient evidence to establish a conspiracy and that defendant was an active participant in the conspiracy. Moreover, a new trial is not required on the conspiracy count.

## *Prolonged Relationship*

First, there was evidence of a prolonged relationship between defendant and his co-conspirator and drug supplier Fletcher Voisin ("Voisin"). Voisin cooperated with the government and testified at defendant's trial. Voisin testified that he and defendant began working together to distribute cocaine and marijuana in early 2009. (Tr. 297, 330, 338-40.) According to Voisin, the relationship continued until at least August 2012, when Voisin was arrested. (Tr. 402-04, 213.) Voisin also testified that as his relationship with defendant strengthened over time, Voisin began to sell larger quantities of drugs to defendant. (Tr. 388-92.) Telephone records show 144 phone calls between Voisin and the defendant between June 19, 2012 and August 3, 2012 (Tr. 212; Gov't Ex. 38), and GPS data indicate that in June 2012 and July 2012, Voisin's telephone pinged within a block of defendant's yard on 16 occasions. (Tr. 721-22; Gov't Ex. 51.) Moreover, cooperating witness Miguel Moonsammy Gonzalez ("Gonzalez") testified that in 2010, when he first arrived in New York, he drove with Voisin to distribute drugs or pick up drug proceeds from defendant. (Tr. 629-30.) Gonzalez also observed defendant deliver drug money

multiple times in 2010 and 2011 to a newsstand owned by Voisin. (Tr. 631-32.)

Testimony from co-conspirators about a three-year drug-trafficking relationship with the defendant — coupled with the nearly three-month period in which their relationship was documented by telephone records — is more than sufficient evidence to establish prolonged cooperation. *See United States v. Baldwin*, No. 08-CR-004, 2009 WL 700648, at *4 (D. Conn. Mar. 16, 2009) ("First, the 16 calls offered by the government involving [the defendant] and [a co-conspirator] spanned from September 27, 2007, until November 11, 2007. The jury could consider this 'prolonged cooperation' between the parties."), *aff'd sub nom. United States v. Glover*, 398 F. App'x 677 (2d Cir. 2010), *abrogated on other grounds by Dorsey v. United States*, 132 S. Ct. 2321, 2335 (2012); *United States v. Romero-Carcamo*, No. 07-CR-034, 2009 WL 1538082, at *3 (D. Conn. May 27, 2009) ("It can be inferred from [the defendant's] frequent travels over a span of two years and [a co-conspirator's] testimony that he made transactions with the defendant on two occasions that there was a prolonged cooperation between [the defendant] and at least . . . one of the co-conspirators."); *see also United States v. Martinez*, No. 10-CR-233S, 2015 WL 5673115, at *6 (W.D.N.Y. Sept. 25, 2015) (finding prolonged cooperation based on six-month relationship between defendant and a co-conspirator).

*Mutual Trust*

Second, there was ample evidence regarding a high level of mutual trust between Voisin and the defendant to render inapplicable the buyer-seller exception to conspiracy liability is inapplicable. Voisin testified that as defendant began to sell increasing quantities of drugs, "we develop[ed] a relationship with trust." (Tr. 391.) Voisin explained that when Voisin would bring drugs to defendant to sell, defendant "would open it up. He would see it. He doesn't really weigh it, because he trust[ed] my judgment." (Tr. 380.) The trust ran in the other direction as well. Voisin testified that when defendant would pay Voisin for the drugs, defendant "would pull out a bag and give me the money and I would just take it. I wouldn't even count it until I reach[ed] home." (*Id.*)

Moreover, defendant was aware that Voisin sourced significant quantities of cocaine and marijuana from Arizona and Trinidad, which he then sold to defendant. (Tr. 325-26, 339, 392-93.) As their mutual trust grew, Voisin sold larger quantities of cocaine to defendant on consignment — between two and five kilograms of cocaine — to sell to defendant's wholesale customers. (Tr. 391-94.)

*Sales on Credit*

Third, as noted above, many of the drug sales in this case were on credit, which is a stand-alone factor supporting a

conspiracy that also further substantiates the mutual trust between defendant and Voisin. The drug sales on consignment — in which defendant would pay Voisin back for larger quantities of drugs as defendant sold them — began in 2010. (Tr. 394-95, 648-50.) By 2011, defendant was paying Voisin exclusively on consignment. (*Id.*) By 2011, the drug transactions between defendant and Voisin involved between two and five kilograms of cocaine. (Tr. 394.) The Second Circuit has consistently affirmed drug conspiracy convictions in similar circumstances, where the defendants "purchased drugs in significant quantities on credit from the selling organization." *See Dickerson*, 789 F.3d at 64 (collecting cases); *Martinez*, 2015 WL 5673115, at *6 (emphasizing consignment sales of large-scale quantities of drugs in rejecting sufficiency challenge to conspiracy conviction).

## *Standardized Dealing*

Fourth, the defendant and Voisin dealt in a standardized fashion over an extended period of time. For three years, Voisin sold defendant a total of between 40 and 50 kilograms of cocaine and between 40 and 50 pounds of marijuana that defendant then distributed. (Tr. 452-54.) Voisin and defendant had a fixed number of locations in which they would conduct drug transactions. For example, toward the later part of their relationship, Voisin testified that he and the defendant principally engaged in drug transactions in three particular locations: defendant's

restaurant, the yard defendant rented, and an apartment defendant rented in Brooklyn. (Tr. 401-04.) Gonzalez — one of Voisin's lieutenants, who also testified against defendant — corroborated Voisin's testimony. Gonzalez testified that he (Gonzalez) was with Voisin on more than 50 occasions when Voisin made drug deliveries to defendant at the three aforementioned locations. (Tr. 652-57.) Voisin also operated a newsstand, and he testified that defendant would come to the newsstand to conduct drug transactions several times in a month using the same subterfuge in which Voisin would pass the drugs over in a "black shopping bag, so it's dark looking, like he bought something from the store." (Tr. 383-84.) Gonzalez also testified that defendant would drop drug proceeds off at Voisin's newsstand in payment for the drugs. (Tr. 631.)

*Drug Quantity*

Fifth, the quantity of drugs the defendant purchased from Voisin underscores the scope and breadth of the conspiracy. As noted earlier, Voisin testified that he sold defendant approximately 40 to 50 pounds of marijuana and approximately 40 to 50 kilograms of cocaine. (Tr. 452-54.) By contrast, in *Dickerson*, on which defendant heavily relies (*see* Def. Post-Trial Mot. at 6-7), the Second Circuit vacated a conspiracy conviction where the relevant defendant was indicted for "conspiracy to distribute and to possess with intent to distribute 28 grams or more of cocaine base." 789 F.3d at 62. The *Dickerson* defendant typically purchased

two 3.5-gram packets of cocaine at a time, "on several days each week, and occasionally more than once per day." *Id.* The kilogram quantities in the instant case dwarf the corresponding quantities in *Dickerson*. Where "there is advanced planning among the alleged co-conspirators to deal in wholesale quantities of drugs obviously not intended for personal use . . . the participants in the transaction may be presumed to know that they are part of a broader conspiracy." *Medina*, 944 F.2d at 65 (finding that two to three kilograms met threshold of "destined for resale").

Finally, Voisin's purchase of the safe for defendant — after defendant was robbed of drug proceeds — shows that their association went far beyond a mere buyer-seller affiliation. (Tr. 438-39.) No conventional drug dealer would buy a safe to protect his buyer and the proceeds he was owed if their relationship was simply one of buyer and seller. *See Rojas*, 617 F.3d at 676 (emphasizing drug seller's provision of bail money to buyer in upholding buyer's conspiracy conviction). The purchase of the safe "evinces [Voisin's] 'shared stake' in [defendant's] 'illegal venture.'" *Id.* (quoting *United States v. Contreras*, 249 F.3d 595, 599 (7th Cir. 2001)).

*Dickerson*, on which defendant relies, is not inapposite. In *Dickerson*, the defendant Dickerson was a regular purchaser of "eight-balls," crack cocaine packets weighing approximately 3.5 grams. 789 F.3d at 62. As noted above, Dickerson typically

purchased two eight-balls at a time, several days per week, and occasionally more than one per day. *Id.* The seller testified that he did not know what Dickerson did with the cocaine he purchased, did not consider Dickerson to be a member of the drug trafficking organization to which the seller belonged, and considered Dickerson to be merely a "reliable customer." *Id.* In vacating Dickerson's conspiracy conviction under the buyer-seller exception, the Second Circuit emphasized that Dickerson purchased cocaine from individuals outside the drug trafficking organization; never purchased cocaine on credit; and was one of approximately 40 regular customers of the drug trafficking organization (who purchased at least some cocaine for personal use). *Id.* at 64-65.

By contrast, in the instant case, the defendant's multi-kilogram drug quantities are a world removed from the significantly smaller quantities at issue in *Dickerson* (Tr. 452-54); a substantial number of the purchases in this case were made on credit (Tr. 394-95, 648-50); Voisin testified specifically that defendant was one of only a handful of distributors with whom he worked (Tr. 395-96); and Voisin was aware that defendant sold to other customers. (Gov't Ex. 10; Tr. 488-90.) Furthermore, there is no indication that defendant purchased drugs from other sellers.[2]

---

[2] Defendant argues that "there is no evidence that Mr. Voisin was the only source of the defendant's narcotics." (Def. Post-Trial Mot. at 6.)

Defendant also emphasizes the absence of evidence showing profit-sharing between defendant and other members of the conspiracy. (Def. Post-Trial Mot. at 4-5, 7.) Profit-sharing, however, is only one relevant factor in evaluating whether the defendant is properly considered a member of a drug conspiracy, as opposed to merely a buyer. *See Rojas*, 617 F.3d at 675 (listing profit-sharing as one of eleven indicia in a "non-exclusive list of considerations relevant to a jury's determination of whether a defendant was a member of a charged conspiracy"). Even if the government failed to establish that defendant directly shared his profits with members of the conspiracy, defendant has pointed to no precedent (and the court has found none) indicating that the absence of profit-sharing precludes a drug conspiracy conviction.

Consequently, defendant is not entitled to an acquittal on the conspiracy count under Rule 29 or a new trial on the conspiracy count under Rule 33.

II. Substantive Counts

Defendant next challenges his convictions on the substantive counts for: (1) possession with intent to distribute five kilograms or more of cocaine (Count Two); (2) possession with intent to distribute 28 grams or more of cocaine base (Count Three); and (3) possession with intent to distribute marijuana

---

Nor is there evidence in the record indicating that defendant received drugs from any other sellers.

(Count Four). (Def. Post-Trial Mot. at 8-9.) To sustain a conviction on the substantive counts, the government must establish that defendant "possess[ed] with intent to . . . distribute . . . a controlled substance." 21 U.S.C. § 841(a)(1). "The essential elements of the crime of possession are that the defendant: (1) knowingly (2) possessed a controlled substance (3) with a specific intent to distribute it." *United States v. Gore*, 154 F.3d 34, 45 (2d Cir. 1998). "The jury is entitled to base its verdict upon inferences from circumstantial evidence, and such evidence need not have excluded every possible hypothesis of innocence." *United States v. Roldan-Zapata*, 916 F.2d 795, 802 (2d Cir. 1990) (internal quotation marks and citations omitted).

Defendant's arguments with respect to the substantive counts, which amounts to little more than a single page (*see* Def. Post-Trial Mot. at 8-9), suggests that in order to sustain the convictions the government was required to show: (1) direct observation by law enforcement of defendant's drug transactions with Voisin or defendant's customers; (2) fingerprint or DNA evidence; or (3) "signs of wealth or possessing large amounts of cash or jewelry." (*Id.* at 9.) Essentially, defendant argues that Voisin and Gonzalez's testimony alone is insufficient to sustain his convictions on the substantive counts. (*Id.*)

The court concludes that the evidence was more than sufficient to sustain the convictions on the substantive counts,

and a new trial is not required. First, the court notes that evidence obtained from defendant's office at Mr. Taste at the time of his arrest included: a clear plastic bag containing 68.1 grams of powder cocaine and three scales with cocaine residue; a clear plastic bag containing 335 grams of marijuana and $2,000 in a filing cabinet; and 44.9 grams of cocaine base inside of a plastic bag in a coat pocket. In addition, an individual in the restaurant at the time of defendant's arrest was in possession of a straw with cocaine residue. (Tr. 24-30, 34-37, 269, 274, 276-78, 280-81.) The jury heard evidence that the quantities outlined above were consistent with distribution. (Tr. 604-05.)

Second, the jury heard evidence from Voisin that Voisin provided the defendant — over the course of their multi-year partnership — with approximately 40 to 50 pounds of marijuana and approximately 40 to 50 kilograms of cocaine. (Tr. 452-54.) Evidence of defendant's drug trafficking and relationship with Voisin was corroborated by Gonzalez, who testified that he was with Voisin on more than 50 occasions when Voisin made drug deliveries to defendant. (Tr. 652-57.) Gonzalez testified that he personally witnessed defendant selling marijuana. (Tr. 675-76.) Defendant's drug trafficking was further corroborated by phone records (Tr. 193-94, 212-13, 473-90, 510-28); geolocation data (Tr. 721-22); and paper and electronic drug ledgers (Tr. Tr. 396-97, 468, 529). There were also recordings of conversations with defendant and

Voisin discussing defendant's drug distribution (Gov't Ex. 10), including one in which defendant asked Voisin for additional drug deliveries because of customer demand. (Gov't Ex. 10; Tr. 488-90.) In short, the evidence went well beyond Voisin and Gonzalez's unadorned testimony.

Defendant contends that without direct observation of defendant's drug trafficking, DNA or fingerprint evidence, or evidence of significant drug trafficking proceeds, his convictions on the substantive counts cannot stand. Defendant cites no authority for these three propositions, and the court can find none. Indeed, courts often find that the above-mentioned evidence is not necessary (or even sufficient in some circumstances) to show an individual's involvement in illegal drug activity. *See United States v. Morales*, 660 F. Supp. 1543, 1545 (S.D.N.Y. 1987) (sustaining § 841(a)(1) conviction even where defendant's co-conspirator was the only individual to testify regarding defendant's direct "hand-to-hand" sale of drugs); *United States v. Boone*, No. 02-CR-1185, 2004 WL 187151, at *6 (S.D.N.Y. Jan. 29, 2004) ("A reasonable juror taking the other pieces of evidence presented 'in conjunction' could determine that . . . the slabs of crack were possessed (or jointly possessed) by the Defendant despite the lack of fingerprint evidence."), *aff'd*, 120 F. App'x 868 (2d Cir. 2005); *United States v. $31,990 in U.S. Currency*, 982 F.2d 851, 854 (2d Cir. 1993) ("At best, the presence of a large

amount of cash . . . supports an inference of illegal activity but does not suggest that the seized currency was tied to the exchange of a controlled substance."). As the Supreme Court has explained, "direct evidence of a fact is not required. Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960).

Accordingly, the court concludes that the evidence was sufficient to sustain defendant's convictions for the substantive drug counts and, further, that defendant is not entitled to a new trial on the substantive drug counts.

## III. *Brady* Motion

Defendant's final argument is that the government breached its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972), when the government failed to disclose a purported informal agreement Voisin reached with Arizona state prosecutors in a related Arizona case. As a result, defendant asks that this court order a new trial or dismiss the indictment against him. The court concludes that there was no *Brady* violation.

"Dismissal of an indictment following a conviction is an extraordinary remedy." *United States v. Lombardozzi*, 491 F.3d 61, 79 (2d Cir. 2007) (internal quotation marks and alterations omitted). "[T]o obtain dismissal of an indictment based upon a

claim of outrageous governmental conduct, a defendant must establish that the government engaged in outrageous behavior in connection with the alleged criminal events and that due process considerations bar the government from prosecuting her." *United States v. Cuervelo*, 949 F.2d 559, 565 (2d Cir. 1991). To the extent that defendant seeks a new trial based on the *Brady* violation, the request for a new trial is governed by the Rule 33 standard set forth *supra*. *See United States v. Hernandez*, 399 F. App'x 685, 687 (2d Cir. 2010) (evaluating request for new trial due to *Brady* violation under the Rule 33 standard).

In *Brady v. Maryland*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The duty applies, as relevant here, to impeachment evidence as well as exculpatory evidence. *See Giglio*, 405 U.S. at 154. "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

A brief recitation of the facts underlying defendant's *Brady* motion is necessary. Voisin was indicted in the Eastern

District of New York on November 9, 2012 for conspiracy to distribute cocaine and marijuana, and for possession with intent to distribute cocaine and marijuana. (No. 12-CR-707, ECF No. 33.) On April 8, 2013, Voisin pled guilty to conspiracy to distribute cocaine and marijuana and unlawful use of a firearm in relation to drug trafficking offenses pursuant to a superseding information and cooperation agreement. (*Id.*, ECF Nos. 50-51.) The cooperation agreement provided that Voisin "agrees to testify at any proceeding in the Eastern District of New York or elsewhere as requested by the Office." (Gov't *Brady* Opp'n, Ex. A, at ¶ 3(d).)

Separately, Voisin was charged in a sealed indictment on April 12, 2013 in Arizona Superior Court, Pima County (the "Pima County Case"), on charges brought by the Arizona Attorney General that substantially overlap with the drug-trafficking charges he faced in the Eastern District of New York. Voisin was never served with a warrant in the Pima County Case. Voisin also provided assistance to prosecutors in two other Arizona-based cases. First, Voisin met on multiple occasions with federal prosecutors in Arizona and investigators targeting one of Voisin's co-conspirators, Joel Sesma-Garcia, who ultimately pled guilty to federal drug trafficking charges in the U.S. District Court for the District of Arizona (the "Federal Sesma Case"). (No. 12-CR-1676 (D. Ariz.).) Second, Voisin ultimately provided testimony (on September 15, 2015) at Sesma's Arizona state court trial on murder

charges (the "Sesma Murder Case"). (No. CR-2014-1090, Superior Court of the State of Arizona, Pima County.)

Although the U.S. Attorney's Office in the Eastern District of New York provided information to defendant regarding each of the aforementioned cases in advance of his trial, defendant alleges that he was not informed about a cooperation agreement reached between Voisin and Arizona state authorities in the Pima County Case. After defendant was convicted in the instant case, Voisin testified in the Sesma Murder Case in Arizona Superior Court on September 15, 2015. A stipulation entered into the record in the Sesma Murder Case informed that jury about the Pima County Case indictment against Voisin, and also stated that:

> Mr. Voisin was cooperating in a case managed in Tucson through the United States Attorney's Office. Once he finishes cooperating and/or testifying for the U.S. Attorney's Office in New York and for the Pima County Attorney's Office, the Arizona Attorney General's Office agreement with Mr. Voisin's defense counsel is that the Arizona indictment will be dismissed with prejudice and he will serve whatever sentence he receives in New York federal Court.
>
> There is currently a warrant for Mr. Voisin's arrest arising out of the Arizona case but that warrant has not been served upon him and will be quashed when the Arizona case is dismissed with prejudice.[3]

(Gov't *Brady* Opp'n at 11-12.) Defendant alleges that there is a reasonable probability that the outcome of his trial would have

---

[3] The assistant United States attorney who tried the instant case represents that she did not learn about the stipulation until defendant filed his *Brady* motion. (Gov't *Brady* Opp'n at 11 n.7.)

been different if the jury had known about Voisin's cooperation with Arizona state authorities in the Pima County Case. The court disagrees.

The alleged *Brady* violation claim fails for three independent reasons. First, Voisin did not know about the sealed Pima County Case indictment at the time of his testimony in defendant's trial and therefore had no incentive to testify falsely at defendant's trial based on a cooperation agreement with Arizona state authorities. Second, even assuming Voisin did know about the cooperation agreement with Arizona state authorities, knowledge regarding the agreement cannot properly be imputed to the Eastern District of New York prosecutors handling defendant's case. Finally, the allegedly suppressed impeachment evidence is immaterial because Voisin was already cross-examined regarding his criminal history and his cooperation with authorities in multiple cases, and there was overwhelming additional evidence against defendant.

## *Voisin Did Not Know About the Pima County Case*

First, there is no indication that, at the time of his testimony at defendant's trial, Voisin even knew that he had been indicted in the Pima County Case in Arizona, let alone about any purported agreement with Arizona state prosecutors. Voisin testified at Sesma's murder trial in Arizona state court on September 15, 2015 that he had only seen the Pima County Case

indictment two weeks before his testimony in that case, well after the trial in defendant's case concluded on July 7, 2015. At the time of Voisin's testimony in the Sesma Murder Case, Voisin was cross-examined by Sesma's attorneys regarding any cooperation agreements he had:

> Q: ... I'm showing you what's been marked as AB, which is your indictment in state court in Arizona?
> A: This is the second time I've seen this document.
> Q: Yes.
> A: You showed me this last Friday or so.
> Q: Right. And you understand now that you have – you were indicted in the State of Arizona?
> A: Yes, I'm aware of now [sic].
> ...
> Q: And an agreement was reached on your behalf through counsel that in exchange for your cooperation with the Federal Government and the State of Arizona that those charges would all be dropped against you, you understand that too, do you not?
> A: It was brought to my attention at that meeting we had a couple Fridays [a]go.

(Gov't *Brady* Opp'n, Ex. 3, at 46-48.) Voisin's testimony in the Sesma Murder Case regarding his knowledge of the Pima County Case indictment, if true, would be dispositive of the instant *Brady* issue, because Voisin could not have been motivated to testify falsely in defendant's case to uphold half of a bargain he did not even know about. *See, e.g.*, *Hemphill v. Senkowski*, No. 02-CV-7093, 2004 WL 943567, at *12 (S.D.N.Y. May 3, 2004) ("[T]he witness was

not aware of the agreement at the time he testified and, therefore, had no motivation to testify falsely.").[4]

Defendant, however, argues that Voisin may have perjured himself at the Sesma Murder Case regarding Voisin's knowledge about Voisin's cooperation agreement with Arizona state prosecutors. (*See* ECF No. 243, Transcript of 11/30/2015 *Brady* Violation Hearing, at 7 ("[T]hat Mr. Voisin testified under oath does not make it part of the Holy Grail.").) Defendant has offered absolutely no evidence, beyond his conclusory assertion, that Voisin testified falsely in the Sesma Murder Case. Indeed, Voisin's attorney has corroborated Voisin's testimony in the Sesma Murder Case regarding Voisin's knowledge of the Pima County Case indictment. Mr. Martin Siegel (defendant's attorney) approached Voisin's attorney, Ms. Joyce London, about her discussions with Voisin regarding the Pima County Case. Ms. London stated: "Not only do I have no recollection of telling [Voisin] there was a sealed indictment against him in [Arizona] state court, I am sure that I did not tell him about the sealed indictment and have no notes indicating that I discussed it

---

[4] Defendant's argument that he was not informed about Voisin's indictment in Arizona state court is meritless. The government provided 18 U.S.C. § 3500 material to defendant in advance of trial revealing the existence of Voisin's Arizona state court indictment. (*See* Gov't *Brady* Opp'n, Ex. 2 (reporting existence of "14 total indictments from the Pima County Superior Court grand jury" and listing Voisin as one of the 14 individuals indicted).) Defendant was also well aware of Voisin's cooperation in the Federal Sesma Case. (*See* Gov't *Brady* Opp'n at 10 n.6.)

with him."[5] (ECF No. 242.) Because Voisin did not know about the indictment in the Pima County Case (let alone about any cooperation agreement, informal or formal, involving the Pima County Case indictment) at the time of his testimony in defendant's case, neither the Pima County Case indictment nor defendant's alleged cooperation motivated him to testify falsely.

*Knowledge Regarding Voisin's Cooperation Agreement With Arizona State Authorities is Not Properly Imputed to the Prosecutors in This Case*

Second, even assuming Voisin had knowledge of any purported agreement linking his testimony in defendant's case with the dismissal of the Pima County Case indictment, the Eastern District of New York prosecutor cannot be charged with knowledge regarding an agreement reached between Voisin and Arizona state prosecutors in a separate case. Although a prosecutor is presumed to have knowledge of all information gathered in connection with

---

[5] London also states that her understanding was that the Pima County Case indictment would be dismissed in exchange for Voisin's guilty plea to the Eastern District of New York indictment. (ECF No. 242.) London explained that the dismissal of the Pima County Case indictment was therefore not dependent on Voisin's testimony in *any* case. (*Id.*) The court notes that London's understanding conflicts with the representation made by the government in this case about the agreement between Arizona state prosecutors and Voisin's counsel. According to the government, the Arizona state prosecutor "informed [Ms. London] that once Voisin testified honestly and truthfully in any pending Arizona cases and completed his cooperation in the Eastern District of New York, the prosecutor would dismiss the Pima County Case." (Gov't *Brady* Opp'n at 10.) Resolution of the factual dispute presented by the two conflicting understandings of Ms. London and the Arizona state prosecutor is unnecessary, because the court concludes that Voisin had no knowledge, at the time of defendant's trial, of either the Pima County Case or any agreement relating to the Pima County Case.

*his* office's investigation and prosecution of a case, *see United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998), and also has an obligation "to learn of any favorable evidence known to the others acting on the government's behalf *in the case*, including the police," *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (emphasis added), "knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor." *Avellino*, 136 F.3d at 255; *see also United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993) ("We will not infer the prosecutors' knowledge simply because some other government agents knew about [the evidence].").

In evaluating whether an individual's knowledge is properly imputed to a prosecution team, courts often consider "whether the individual actively investigates the case, acts under the direction of the prosecutor, or aids the prosecution in crafting trial strategy." *United States v. Meregildo*, 920 F. Supp. 2d 434, 442 (S.D.N.Y. 2013), *aff'd sub nom. United States v. Pierce*, 785 F.3d 832 (2d Cir. 2015). In *United States v. Quinn*, 445 F.2d 940, 944 (2d Cir. 1971), the Second Circuit refused to impute knowledge on the part of a federal prosecutor in Florida to a federal prosecutor in New York where there was no basis for concluding that they shared information or that the New York prosecutor had reason to know about information in a sealed indictment in Florida. *Id.* The court reasoned as follows:

> [A]ppellants take the completely untenable position that "knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor" and that "he [the New York prosecutor] must be deemed to have had constructive knowledge of this evidence. . . ." The Department of Justice alone has thousands of employees in the fifty States of the Union. Add to these many more thousands of employees of "any part of the government." Appellants' argument can be disposed of on a "reductio ad absurdum" basis.

*Id.; see also United States v. Abrams*, 205 F.3d 1325 (2d Cir. 1999) (confirming continued vitality of the reasoning in *Quinn*); *Avellino*, 136 F.3d at 256 (same).

Here, the government has conceded that there was at least some informal agreement between the Arizona state prosecutor and Voisin. (Gov't *Brady* Opp'n at 10.) The government has likewise conceded that the Arizona state prosecutor conveyed her intent to dismiss the state charges against Voisin to an assistant United States attorney in the District of Arizona who was prosecuting the Federal Sesma Case. (*Id.*) On the other hand, defendant has conceded that the purported informal agreement between Voisin and the state prosecutors was not known by the assistant United States attorneys prosecuting defendant here in the Eastern District of New York. (*See* ECF No. 243, Transcript of 11/30/2015 *Brady* Violation Hearing at 21 ("I'm saying the U.S. Attorney in Arizona and the state prosecutor, there were agreements and there were understandings between those two parties. And for some reason that information was not relayed to the U.S. Attorney here in Brooklyn.").) Indeed,

the Eastern District of New York prosecutors have affirmatively represented that they were not aware of the conversation between the Arizona state prosecutor and the Arizona federal prosecutor. (Gov't *Brady* Opp'n at 10, 19; Transcript of 11/30/2015 *Brady* Violation Hearing at 18, 30.)

The court concludes that knowledge of the agreement cannot properly be imputed to the Eastern District of New York prosecution team prosecuting defendant. Defendant has proffered no evidence indicating that the Arizona prosecutors (federal or state) worked alongside the prosecution team in defendant's case in any significant way. The Arizona prosecutors do not appear to have actively investigated defendant's case, there is no allegation that they acted under the direction of the prosecution team in defendant's case, and there is no evidence that the Arizona prosecutors were involved in crafting trial strategy in defendant's case. *See Meregildo*, 920 F. Supp. 2d at 442. Imputation of the Arizona prosecutors' knowledge of an agreement with Voisin to the prosecutors in defendant's case is therefore inappropriate.

*The Allegedly Suppressed Impeachment Evidence is Not Material*

Finally, defendant's claimed *Brady* violation falters on the materiality prong. Where the government has failed to disclose favorable evidence to a defendant, relief is appropriate only if the evidence was "material." *See, e.g., United States v. Bagley*, 473 U.S. 667, 678 (1985). "[F]avorable evidence is material, and

constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433-34, (internal quotation marks omitted).

As an initial matter, a "new trial is generally not required . . . when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." *United States v. Payne*, 63 F.3d 1200, 1210 (2d Cir. 1995). In this case, Voisin was already extensively cross-examined not just on his prior criminal actions (including drug trafficking, car jackings, robberies, firearms trafficking, money laundering, and tax fraud), but also regarding his substantial cooperation with law enforcement. (Tr. 298-304, 305-25.) Voisin testified on direct examination that he had "prepared for [defendant's] trial and *other trials*" (Tr. 304 (emphasis added)) and testified on cross-examination specifically about his cooperation with Arizona authorities:

> Q: Now, I think in response to one of [the prosecutor's] questions, she talked about your assistance to the government in this and other cases?
> A: Yes, she did.
> Q: Have you cooperated with the government in connection with other separate criminal matters?
> A: Well, the other case in Arizona.
> . . .

> Q: Did you provide assistance to the prosecution or to law enforcement in that case?
> A: Yes, I did.
> . . .
> Q: In your mind, besides your cooperation in this case, you're hoping that the cooperation in Arizona would be reflected or contained in a letter that the prosecutors are going to write to the judge?
> A: Yes.

(Tr. 559-61.) Although it is not absolutely clear from Voisin's testimony whether he is referring to the Federal Sesma Case or the Sesma Murder Case, the above cross-examination colloquy reveals that defendant had ample opportunity to attack Voisin's credibility based on his cooperation in multiple cases. Further, defendant is properly charged with knowledge of Voisin's indictment in the Pima County Case and the federal case in Arizona in which Voisin was not charged, because documents and information regarding Voisin's Pima County Case indictment and his debriefing by the federal prosecutor in Arizona were disclosed to defendant in advance of defendant's trial in the government's § 3500 material. (Gov't *Brady* Opp'n at 8-10.) Defendant was therefore free to cross Voisin regarding the charges he faced in the Pima County Case and his meetings with the federal prosecutor in Arizona.

Defendant argues that Voisin's cooperation with Arizona state authorities had significant impeachment value because it allowed him to avoid the possible life sentence he faced in the Pima County Case. Defendant's contention, however, ignores that

based on the charges he pled to in the Eastern District of New York indictment, Voisin already faced a maximum of life in prison on two counts with sentences required by statute to run consecutively. (Tr. 301, 545-46.) Defense counsel also established (multiple times) that the maximum end of the sentencing guidelines range contemplated in Voisin's plea agreement was 465 months.[6] (Tr. 543-44, 547.) The additional impeachment value of Voisin's cooperation with Arizona state authorities was therefore negligible. *See United States v. Hernandez*, 399 F. App'x 685, 686-87 (2d Cir. 2010) (finding that allegedly suppressed evidence about a "key government witness['s]" mental illnesses and use of psychedelic drugs was immaterial in light of the witness's admissions at trial regarding his mental illnesses and a letter from prosecutors to defense counsel stating that the witness suffered from "one or more psychological problems").

Finally, as discussed above, ample additional evidence corroborated Voisin's testimony, including: Gonzalez's testimony regarding defendant's drug trafficking; the wiretap recordings; the distribution quantities of marijuana, cocaine, crack cocaine, cash, and scales in defendant's office on the day of his arrest at Mr. Taste; the geolocation data; and the paper and electronic drug ledgers. There is no "reasonable probability that . . . the result

---

[6] Voisin was already 40 years old at the time of his testimony in defendant's case. (Tr. 295.)

of the proceeding would have been different" if the jury had known about Voisin's cooperation with Arizona state authorities. *Kyles*, 514 U.S. at 433-34. Accordingly, defendant is not entitled to a dismissal of the indictment or to a new trial.

## CONCLUSION

For the foregoing reasons, defendant's post-trial motions are DENIED. Sentencing will take place as scheduled on April 27, 2016 at 2:30 p.m. in Courtroom 6C South.

**SO ORDERED.**

_____/s/_____
KIYO A. MATSUMOTO
United States District Judge

Dated:

April 26, 2016
Brooklyn, New York